360 So.2d 914 (1978)
John H. WHITE, d/b/a White Construction and Equipment Rental Company, Plaintiff-Appellant,
v.
RIMMER & GARRETT, INC., Defendant-Appellee.
No. 6568.
Court of Appeal of Louisiana, Third Circuit.
June 28, 1978.
*915 Camp, Carmouche, Palmer, Carwile & Barsh, Karl E. Boellert, Lake Charles, for plaintiff-appellant.
Aaron, Aaron & Chambers, Noble M. Chambers, Jr., Crowley, for defendant-appellee.
Before DOMENGEAUX, WATSON and GUIDRY, JJ.
GUIDRY, Judge.
This case is before us on appeal after remand by the Louisiana Supreme Court for the introduction of evidence relative to the assessment of damages due plaintiff as a result of defendant's breach of a construction subcontract. This appeal is limited solely to the issue of quantum.
The facts giving rise to this suit as well as the history of previous litigation may be summarized as follows:
On October 9, 1971, John H. White d/b/a White Construction & Equipment Rental Company (White), as subcontractor, and Rimmer & Garrett, Inc. (R & G), as contractor, entered into a written subcontract agreement whereby White undertook to perform certain excavation and dirt hauling work in accordance with a primary contract previously entered into between R & G and the Louisiana Department of Highways for the construction of a portion of the I-210 bypass in Lake Charles, Louisiana. The portion of the primary contract that was to be performed by White was designated as Item 203(5) and was further described as "Cubic Yards Special Borrow Excavation'". The approximate quantity of material required was listed as 1,738,540 cubic yards. Article 2 of the subcontract provided that White was to furnish all labor, materials and equipment and to perform all work for Item 203(5). White's principal duties involved the excavation of dirt from a "borrow pit" and the transportation of this material to the highway construction site. The unit price for the work was set forth on a declining scale according to the quantity of special borrow excavation.
On October 14, 1971, the parties signed a supplemental agreement which further delineated White's obligations under the terms of the contract. Among other things, this agreement specifically excluded any special borrow located north of Interstate 10 from the terms of the contract, and provided that White's responsibilities under Item 203(5) would include loading, hauling and spot dumping on the project. The agreement further contained a provision which stated "The minimum special borrow quantity will be 1,000,000 Cubic Yards".
A dispute concerning the configuration of the borrow pits resulted in a second supplemental and amending agreement between the parties dated April 10, 1972. This second agreement consisted of fourteen numbered paragraphs and provided, inter alia, that the shape of the pit was to be as shown on a plat of the Waterloop Subdivision dated January 21, 1972. R & G agreed to pay White at a flat rate of $.915 per yard for all material heretofore and subsequently removed. A handwritten provision which stated "one million cu. yd. Guaranteed" was added and initialed by the parties.
Work on the project was resumed. However, difficulties which arose between the parties eventually culminated in the filing, on March 19, 1973, of a suit by White against R & G seeking specific performance, accounting and/or damages. R & G reconvened seeking damages allegedly incurred as a result of the failure of White to abide by the terms of the contract. At the time that White ceased work, it appeared that White had only hauled 985,650 cubic yards of dirt.[1]
White was claiming that he was entitled under the terms of the contract to excavate and haul all of the dirt required for the completion of Item 203(5) with the exception of the area located north of Interstate 10 and a "scraper" item which, pursuant to an oral agreement, was to be excavated by R & G. On the other hand, R & G took the position that White was only entitled to *916 excavate and haul 1,000,000 cubic yards of material.
The trial court determined that White was entitled to excavate and haul only 1,000,000 cubic yards. Based upon a finding that White had received payment for 985,650 cubic yards of material, the trial court awarded White the contract price of $.915 for the difference, i. e., 14,350 cubic yards, which amounts to the sum of $13,130.25. R & G's reconventional demand was denied.
On appeal, this court held that the subcontract as amended by the two supplements was ambiguous, and that parol evidence was admissible to ascertain the true intent of the parties. White v. Rimmer & Garrett, Inc., 328 So.2d 686 (La.App. 3rd Cir. 1976). After considering the evidence in the record, we affirmed the trial court's determination that White was entitled to haul only 1,000,000 cubic yards of dirt. The trial court's damage award was however amended and reduced by awarding White his average profit over the contract period (13.95¢ per cubic yard) for each additional yard that White was entitled to haul (14,350 cubic yards) which equals the sum of $2,001.83.
Writs were granted by our Supreme Court. After concluding that the contract as amended was not ambiguous and thus parol evidence was not admissible to vary the terms of the contract, the Supreme Court held that White enjoyed the exclusive right, with some exceptions, to excavate and haul all of the dirt required for Item 203(5) and that White was entitled to damages for R & G's usurpation of this right. White v. Rimmer & Garrett, Inc., 340 So.2d 283 (La.1976). These damages were to be assessed according to the amount of loss sustained and the profit of which White had been deprived. Lost profit was to be determined by deducting the cost of labor and materials from the total contract price. The Supreme Court noted that the Court of Appeal was in error in assessing White's lost profit on the proportionate basis of his net income experience on the job, as this figure would also include expenses which were fixed and not variable with the amount of dirt actually hauled. The case was remanded for the purpose of the introduction of evidence relative to the computation of White's lost profits and also for the determination of the amount of cubic yards on which to assess damages.
The Supreme Court set forth the proper formula for the determination of this latter item as follows:
". . . the amount of dirt actually used for Item 203(5) less (1) the dirt White actually hauled and was paid for (985,650); (2) the 86,000 cubic yards of fill hauled by R & G north of I-10 and (3) the amount R & G was responsible for as the `scraper'2 item."
On remand, the court was directed to ascertain the total amount of dirt actually used for Item 203(5) and the amount of the "scraper" item.
On rehearing, the Supreme Court, in a brief per curiam opinion, recognizing that final figures for the yardage actually used in Project Item 203(5) varied substantially from the yardage estimates the parties had initially agreed to use, amended its decree as follows:
"In our original opinion we stated that the case is remanded to ascertain the total amount of dirt used on Item 203(5) and the amount of the `scraper' item. In order to avoid any injustice to either party, on remand the court will not be bound by any figures mentioned in the opinion. Thus, on remand, the parties may introduce evidence to determine the figures in the formula for determining the amount of cubic yards on which to assess the damages: the amount of dirt actually used for Item 203(5) less (1) the dirt White actually hauled and was paid for; (2) the cubic yards of fill hauled by Rimmer & Garrett, Inc. north of I-10 and (3) the amount Rimmer & Garrett, Inc. was responsible for as the `scraper' item. In all other respects the original opinion is correct."
On remand, evidence relevant to the issue of quantum was taken by the trial court. The district judge, in detailed written reasons, *917 computed the amount of cubic yards that White was entitled to haul as follows:

"Amount of dirt actually
used for Item 203(5) .......... 1,398,459.70
Less:
(1) Dirt White actually
hauled and was paid for ........ 912,801.00[2]
(2) Fill hauled by R & G
north of I-10 .............. 141,126.10
(3) Scraper item ............... 121,885.31
 __________
TOTAL.......................... 222,647.29"

The trial judge next computed the amount of White's gross profit to be $.421 per cubic yard. This figure was then multiplied times the amount of yards that White was entitled to haul but was prevented from hauling (.421 × 222,647.29) resulting in total lost profits of $93,734.50. From the latter sum the trial judge deducted the total amount of an alleged overpayment received by White, i. e., the sum of $66,656.84, and rendered judgment in favor of White for the net sum of $27,077.66, with legal interest from March 19, 1973, until paid. R & G was cast for all costs.
White has appealed from the judgment of the trial court contending (1) that the trial court erred in concluding that White had received an overpayment in the sum of $66,656.84 and (2) that, the trial court erred in its determination of the amount to be allowed as the "scraper" item.
R & G answered White's appeal, contending that the judgment of the trial court should be reversed and the damage award reduced to zero, and further that interest on any damage award, if any is made, should be awarded only from the date of the signing of the trial court's judgment on remand in December of 1977.
The record reflects that White did all of his excavation and hauling out of Borrow Pit No. 1 which was also known as Waterloop Pit No. 1. White began work in November, 1971 and ceased hauling in March 1974. R & G began hauling out of this same pit, although from a different area in approximately April, 1972. R & G also hauled dirt from other borrow pits. The Department of Highways, by means of "cross sectioning" the borrow pits, arrived at monthly estimates of the amount of dirt that was being excavated. Separate measurements by "cross sectioning" were taken of the areas that were being excavated by White and R & G. Payments were made by the Department of Highways to R & G on the basis of these monthly estimates. R & G would, in turn, make payments to White in accordance with these same estimates. An error in measuring the quantity of dirt taken from the borrow pits somehow occurred, resulting in an overpayment by the Department of Highways to R & G. A portion of this error occurred in Borrow Pit No. 1.
The record indicates that from the first through the twenty-sixth partial estimates, the Department of Highways made payment for 1,196,365.78 cubic yards of material out of Borrow Pit No. 1, from which White did all of his hauling. Subsequent to these estimates, White hauled and was paid for an additional 30,000 cubic yards of material out of this same pit. The Department of Highways, therefore, paid for a total of 1,226,365 cubic yards of material out of Borrow Pit No. 1. However, the final figures of the Department of Highways reflected that only 1,135,722 cubic yards of material were actually excavated and hauled out of this Borrow Pit. This amounts to an overpayment by the Department of Highways in the amount of 90,643 cubic yards in Borrow Pit No. 1.
The trial judge apportioned the overpayment in the following manner:
In order to establish the percentage of the whole that each party was paid for hauling, the total number of yards that White was paid for hauling (985,650) was *918 divided by the total number of yards that the Highway Department had paid for out of Borrow Pit No. 1 (1,226,365). The trial judge thus determined that White was paid for hauling 80.37% of the material that was taken out of Pit No. 1.
The trial judge then computed White's pro-rata share of the overpayment by taking 80.37% of the total overpayment which occurred in Pit No. 1 (90,643), arriving at the amount of 72,849.77 cubic yards. By deducting this amount (which represents the quantity of dirt that White received payment for but did not haul) from the total yardage for which White received payment (985,650) the trial judge found that White had actually hauled only 912,801 cubic yards of material. The trial judge thus ultimately concluded that White had been overpaid the amount of $66,656.84 (72,849 cubic yards × $.915) and that this sum must be deducted from any amount found to be owing to White by R & G.
We find sufficient evidence in the record to support the trial judge's conclusion and are of the opinion that the trial court properly determined that White must bear his pro-rata share of the overpayment made by the Department of Highways to R & G for material excavated from Borrow Pit No. 1. The exact area of Pit No. 1 in which the error occurred was never determined. It is also not known whether the error was made in a particular cross section or occurred on a cumulative basis. The record, however, clearly indicates that the payments that White received from R & G were based on the same monthly yardage estimates upon which payments were made by the Department of Highways to R & G. Therefore, any excess payment made by the Department of Highways to R & G on the basis of an erroneous monthly estimate was necessarily passed on to White.
Although it is impossible to precisely ascertain the exact amount of the overpayment received by White, we conclude that, under the circumstances, the method of apportionment utilized by the trial court reaches a fair and equitable result.
White's only remaining contention concerns the amount allotted by the trial court as the "scraper" item. This item consists of an oral agreement between the parties which allowed R & G to haul some of the top soil required for the project by means of its "scraper" machinery. The dispute is over the quantity of dirt which R & G was entitled to haul pursuant to this agreement. White contends that the trial court erred in including in the "scraper" item 82,922.04 cubic yards of material that was hauled by R & G from a pit (known as the Trouard Pit) which it acquired subsequent to the oral agreement between the parties. White argues that the "scraper" item exclusion should apply only to areas that were known to the parties at the time of the verbal agreement. R & G, on the other hand, refers to the deposition of Mr. White that was taken in October, 1973 in which Mr. White stated that he agreed that R & G could haul 100,000 to 125,000 yards of dirt with the scrapers. The trial judge determined the amount of the "scraper" item to be 121,885.31 cubic yards. In arriving at this figure the trial judge apparently concluded that the quantity of dirt hauled from the Trouard Pit should be included as part of this item. This basically involves a factual determination of the intentions of the parties at the time they entered into this oral agreement. We discern no manifest error in the factual conclusions of the trial judge in regard to this issue. Canter v. Koehring Company, 283 So.2d 716 (La.1973).
The trial judge determined from evidence in the record that White's gross profit per yard of dirt hauled was $.421, depreciation of equipment not being included. White does not complain of this determination. In brief before this Court, R & G contends that depreciation for use of White's trucks should be included in arriving at the gross expense per cubic yard.
The Supreme Court, with regard to expenses which were properly allowable in computing the amount of White's profit, stated:
"However, it was error for the Court of Appeal to assess White's lost profit on the *919 proportionate basis of his net income experience on the job, for such a figure also includes expenses which are fixed and not variable with the amount of dirt actually hauled by White. The proper deductions only include those expenses, such as fuel, oil, truckers' salaries, etc., which would have been incurred had White completed the job." (emphasis added)
Our resolution of this issue depends on whether depreciation is to be considered a fixed or variable expense. Although each yard of dirt hauled necessarily resulted in some degree of wear and tear on White's trucks, from evidence in the record, we determine that it is an acceptable accounting practice to treat depreciation as a fixed cost unless it is computed on a unit of output method. The evidence reflects that White followed the accounting practice of treating depreciation as a fixed cost. We also find it significant that depreciation was not enumerated as an item of variable expense by the Supreme Court. We conclude that the trial court properly disallowed depreciation in computing the amount of White's gross profit.
R & G, in its answer to White's appeal, contends that the trial court erred in awarding interest from the date of judicial demand and asserts that, for lack of a better date, interest should be awarded only from the date of the signing of the trial court's judgment on remand. We conclude that the trial court erred in awarding interest from date of judicial demand, however, we reject R & G's contention that White is entitled to interest only from the date of the trial court's judgment on remand.
Interest on claims ex-contractu is recoverable only from the time that they become due, whether liquidated or not. LSA-C.C. art. 1938; Calhoun v. Louisiana Materials Co., Inc., 206 So.2d 147 (La.App. 4th Cir. 1968, writ refused).
In the recent case of Alexander v. Burroughs Corporation, 359 So.2d 607, Louisiana Supreme Court Docket No. 61106 (1978), the court, although concluding that in matters of contract seven per cent per annum interest, unless otherwise stipulated, on a damage award is due from the moment of an active violation of a contract or from the time the debtor has been put in default when the breach is passive, determined that interest in such cases is awardable only from the date the amount of the award is ascertainable.
The record in this case indicates that the contract in question had not been completed on the date that suit was filed by White. In fact, additional yardage continued to be hauled by White for approximately one year after White's suit was filed. When suit was filed the exact number of cubic yards of dirt necessary for completion of Item 203(5) was unknown. The exact amount of dirt required for completion of the project was not ascertainable until the last load was hauled and spot dumped. Ascertainment of the amount of damages to which plaintiff is entitled was totally dependent upon the total number of cubic yards required for completion of Item 203(5). The record is not clear as to when the last load of dirt was hauled, however, the evidence does show that on December 19, 1974, the Louisiana Department of Highways accepted Project Item 203(5). Clearly, on the latter date all sums due in relation to that project item were due and ascertainable. We will therefore award interest to White from the date Item 203(5) was accepted and the trial court judgment will be so amended.
The record initially reflects that R & G has withheld the sum of $6,764.02 from White as retainage on the project. R & G admits that White is entitled to be paid this sum. White is entitled to recovery of this amount in addition to that awarded by the trial court.
For the above and foregoing reasons, the judgment of the district court is amended so as to award White judgment for the retainage and to award interest on the amount of judgment from the date Item 203(5) was accepted. In all other respects the judgment appealed from is affirmed. Accordingly, the judgment appealed from is recast to read as follows: IT IS ORDERED, ADJUDGED AND DECREED, that there *920 be judgment in favor of plaintiff, John H. White, d/b/a White Construction & Equipment Rental Company and against defendant Rimmer & Garrett, Inc., in the amount of $33,841.68 with legal interest thereon from December 19, 1974, until paid. Rimmer & Garrett, Inc. is cast for all costs in the trial court. Costs of this appeal are assessed one-half to John H. White d/b/a White Construction & Equipment Rental Company and one-half to Rimmer & Garret, Inc.
AFFIRMED AS AMENDED.
NOTES
[1] For reasons expressed later in the body of this opinion, we conclude that White actually hauled less than 985,650 cubic yards of material.
[2] As more fully explained hereafter, the figure in Item (1) of the trial judge's computations is substantially less than the previous quantity of 985,650 cubic yards which had been heretofore utilized as the quantity of dirt that White had actually hauled and was paid for. The trial judge determined that because of an error in measurement that was somehow made by the Louisiana Department of Highways White was paid for hauling 985,650 cubic yards of dirt, but he did not actually haul this amount of material.